UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL ACTION NOS. |
| | ) | 2:22-cr-111 |
| v. | ) | 2:23-cr-071 |
| | ) | |
| LEON DELIMA, | ) | |
| Defendant. | ) | |

SENTENCING
Tuesday, June 25, 2024
Burlington, Vermont

BEFORE:

    THE HONORABLE CHRISTINA C. REISS,
    District Judge

APPEARANCES:

EUGENIA A.P. COWLES, ESQ., U.S. Attorney's Office, 11 Elmwood
    Avenue, 3rd Floor, P. O. Box 570, Burlington, VT
    05402-0570, Counsel for the Government

SARA M. PULS, ESQ., Office of the Federal Public Defender, 95
    Pine Street, Suite 150, Burlington, VT 05401, Counsel for
    the Defendant

JENNA M. BRACE, U.S. PROBATION

LEON DELIMA, DEFENDANT

Johanna Massé, RMR, CRR
Official Court Reporter
P. O. Box 5852
Burlington, VT 05402
802-951-8102 | 802transcripts@gmail.com

Tuesday, June 25, 2024

(The following was held in open court at 10:00 AM.)

COURTROOM DEPUTY: Your Honor, the matters before the Court are criminal case numbers 22-CR-111 and 23-CR-71, United States of America v. Leon Delima. Representing the Government is Assistant United States Attorney Geni Cowles; present with the defendant is his attorney, Sara Puls; and we are here for sentencing.

THE COURT: Good morning.

MS. PULS: Good morning.

MS. COWLES: Good morning, your Honor.

THE COURT: Mr. Delima, I told you the first thing I would do at sentencing is tell you whether I accept the 11(c)(1)(C) plea agreement with a binding sentencing range of 37 to 55 months. I am going to accept it. It's a reasonable range based on the guidelines and the 3553(a) factors, so I will sentence you within that range.

I have read the presentence report, your sentencing memoranda, the letters and the exhibits.

Let me make sure you've read the presentence report as well.

THE DEFENDANT: Yes, I have.

THE COURT: And have you had an opportunity to discuss it with your attorney?

THE DEFENDANT: Yes, I have.

THE COURT: Are there any factual errors in the report?

THE DEFENDANT: Not that I'm aware of.

THE COURT: How about from your perspective, Ms. Puls? Any factual errors?

MS. PULS: No, your Honor.

THE COURT: How about from the Government's perspective?

MS. COWLES: No, your Honor.

THE COURT: The Court adopts the presentence report as its findings of fact in this matter.

I don't believe we have any guideline issues. Does anybody think differently?

MS. COWLES: No, your Honor.

MS. PULS: No, your Honor. Thank you.

THE COURT: All right. So I'm going to tell you some of the things that I am thinking about in this case. You should feel free to take the Court in a different direction, present other things to think about, push back about what I'm thinking about. These are just some of the things that have come to mind.

Mr. Delima is certainly a puzzle and a complicated individual with a lot of strengths but also some really concerning behavior. So I'm really concerned about the latest DRs in March -- or I should say DR, singular, in March of 2024,

because that doesn't seem to be a reaction to going to Brooklyn, and I don't know why he would be engaging in that kind of behavior. So that's concerning to me.

When I look at the criminal history, there's a fair amount of violence. It's got multiple victims, multiple female victims, and that kind of behavior is the public safety concern.

His PPP loan fraud, as the probation officer pointed out to me, a lot of people who have engaged in that are getting probation. His fraud was on a bigger scale, at least the second one, but that's a financial crime. The victim is all of us as taxpayers, and I think he could stop that behavior.

Buried within the record is obviously a sign that Mr. Delima's capable of forming strong relationships, and he's apparently super smart and super capable. So I'm just wondering what's going to turn this in the right direction, how did we get into this mess.

Obviously he's had a lot of challenges in his childhood. Even so, it doesn't necessarily seem to kind of produce a coherent narrative or explanation of why we're here, and Mr. Delima's probably the best source of how all that happened.

So some promise in that it's not everybody who gets to be super smart and have super good abilities to do good work, and then the violence is concerning.

So I'll start with you, Ms. Puls.

MS. PULS: Thank you, your Honor.

As set forth in our sentencing memorandum, we are requesting a downward variance from the low end to the lowest end of the deeply capped 37 months, and I'll start with the Court's concerns.

So in terms of the March DR, March 4th, 2024, I believe that occurred at Strafford. The time frame on the incidents from February 26th to March 4th, those were all related to an ongoing acute mental health incident, and I understand that after Mr. Delima was moved to Strafford, the hope was that that would really help solve the problem. Unfortunately, the lingering -- I believe the diagnosis from Keith Smith, counselor Keith Smith, was the acute stress disorder with dissociative features, so the impact of that event really lingered with Mr. Delima. He was still working through really an acute mental health crisis at that time, and --

THE COURT: Well, I think the -- I think that falls apart. So I agree when you think that you've seen people being beheaded and their heads are on skewers that that is not somebody who is talking in the right mind, and even though he did pick up disciplinary reports, one of them at least recognizes this as a person in the middle of a mental health crisis.

This is a year later, and one of the sentencing memo's points was he's turned it around, he's not doing that anymore,

he hasn't had any DRs since, and it seems pretty gratuitous.

So you think that's another mental health crisis?

MS. PULS: I apologize, your Honor. What specific incident are you referring to? I thought you were referring to the March 4th, 2024.

THE COURT: I am. So --

MS. PULS: So --

THE COURT: -- I thought we were, like, done with this --

MS. PULS: No.

THE COURT: -- and then we have one in 2024, in February, and we have one in March of 2024.

MS. PULS: So the -- from defense perspective, the sort of purely disciplinary issues, the last one was in June of 2023. Most recently, the February 2024, the acute mental health crisis, really, took place over a -- it was a couple-week period.

So you have the February 26 incident listed on page 5. That incident -- that, again, crisis was ongoing into the next week on March 4th. So there's not a lengthy period between those. It's a matter of days. The initial mental health crisis began -- as corroborated by the jail records and by Counselor Smith's evaluation, began due to an acute stress reaction at MDC Brooklyn.

We requested, because of what Mr. Delima was experiencing,

that he be moved to Strafford, and he was. Unfortunately, the sort of symptoms or the reaction he was having continued to persist for a few days afterwards, and so it was really this finite time in 2024 where this was occurring.

So the -- I believe the argument stands that but for this sort of finite period in 2024 where I believe we have corroborated it was the product of a mental health crisis, he did not have any purely disciplinary issues or has not for over a year, if that clears things up.

THE COURT: Okay. You threw me -- you're right on the timeline. You threw me that he hasn't had any disciplinary issues for over a year. What you are attributing to mental health, then, is everything in 2024, which includes an assault, acting in a way that abuses operation of the facility, acting in a way that abuses operation of the facility.

And then is there any explanation for the June 2023 four DRs?

MS. PULS: So, your Honor, in terms of the June 2023 DRs, I think overall -- and we didn't get into the details in terms of any specific objections to the PSR, but I think what Mr. Delima would note was these were allegations. He never had a disciplinary hearing. There was allegedly some video evidence of some of these allegations, and it turned out that that was false, that there wasn't actually video evidence.

My office had attempted to sort of try to get to the

bottom of what had been going on in terms of trying to see what the evidence was. We were never successful in obtaining anything that -- in terms of the evidence that the jail was alleging they had against Mr. Delima.

So I don't think we're necessarily making, you know, excuses or trying to deny any, you know -- I think Mr. Delima will admit that there was some wrongdoing at the jails during that time period. I don't think he necessarily agrees with all of the allegations, and in fact, there was never an actual finding. They never actually had a hearing to --

THE COURT: I saw that.

MS. PULS: Yeah.

THE COURT: He was moved before they could.

MS. PULS: Yup.

THE COURT: Here's my concern, is the jail -- that's the jail's business. He's been punished for it. I'm just worried about what it spells for the future in terms of public safety.

MS. PULS: Thank you, your Honor. And I think our point, your Honor, is that up until that point, Mr. Delima really had been moved quite a bit. Part of it had to do with having multiple hearings, and there were other reasons. So there had been quite a bit of instability in terms of what facility he was at. If you look at the PSR, he was in fact moved to seven different facilities during this 20-month period

of pretrial incarceration. That certainly took its toll on Mr. Delima I think in part due to some of the trauma he experienced during periods of incarceration in his youth and just overall untreated trauma.

I think the point to the Court is that -- I was attempting to make in my written pleadings was that it has been now over a year since what we think is sort of a purely disciplinary issue. That's a year of good behavior but for the mental health crisis in February and March of this year. So I think Mr. Delima did have some insight certainly that -- there was a motion requesting reconsideration of his detention at a certain point. That was denied. I believe -- I'm not recalling whether that was in front of your Honor or the magistrate judge, but regardless, these DRs that were in existence at the time, or alleged DRs, were part of the argument as to why he was not going to be released.

Mr. Delima I think had, you know, a great deal of reflection at that point and is like, "Okay. This cannot keep happening." So for a year, he has, you know, had better behavior. And I think in terms of meeting with Counselor Smith, that is something that took place in that intervening year. He met with Keith Smith, he was given sort of these concrete diagnoses of, you know, "Here's what you need to work on. You have severe alcohol use disorder. You have PTSD. You need counseling, and you need substance abuse treatment."

Mr. Delima has sought for approval to participate in treatment. He had been approved to take place in a treatment program at Strafford before he was moved. He has been participating in treatment with Keith Smith virtually, and I think in terms of public safety, your Honor can look at this period of better behavior, of good behavior where he is actively engaging in treatment, and I think the --

THE COURT: So I think it's totally overstated that it's a period of good behavior. It just isn't. What I will agree with is since March, his behavior has been seemingly perfect. So that's good, because it means that he can behave, and that -- that is a chunk of time. But to look at this pretrial detention and say he's had a lengthy period of good behavior would be an overstatement of what's happened.

MS. PULS: Thank you, your Honor. In my conversations with Mr. Delima, I can attest to the fact that there was certainly severe mental health issues going on during the early spring of this year, and to the extent that that, you know, is a factor against him during this period, again, we would point to he has seemingly been very amenable to treatment. Counselor Smith has very positive things to say about him, and I think this is the first time other than some spotty treatment through the Howard Center in the past that he's had a treatment provider who's really a good fit and has been able to start working through a lot of the trauma that he honestly has never

worked through before, and I think that's sort of at the heart of the substance use disorder. It's at the heart of the PTSD. It's at the heart of the offense conduct in this case.

So in terms of public safety, I think the Court can look at the progress Mr. Delima has made, you know, however much credit for the past year or the past few months that the Court wants to give it, and feel assured that with correct treatment, Mr. Delima really can thrive. He has very good insight. He's very smart. He's very motivated to succeed. He has a fiancée and many young children who he wants to be out with and parenting.

I think another positive factor in Mr. Delima's favor in this case, and it's sort of easy to miss, but in terms of the timeline, Mr. Delima was arrested on state reckless endangerment charges, and he was released on conditions on July 4th of 2022 -- or July 5th. I apologize. He was out on state pretrial release from July until October 7th, I believe, of 2022. This period before the federal case, he was out on state pretrial release. It's not as vigorous of a supervision as federal probation would certainly impose, and he didn't pick up any violations of conditions of release. He didn't pick up any new charges.

By his fiancée's corroboration, we know that this was really a period of stability for Mr. Delima. He was not drinking. He was helping to parent their children, and, you

know, this was really a stable period for him, which I think is in part why having to go in at the point he went in in October of 2022, he now knows he can do it. He knows he can be out and be stable. He had that period where, you know, the charges were brought and he was out. He stopped drinking. He had a stable family life. And in terms of being motivated to succeed, that sort of glimpse of what he had and lost by going in in October and now having been in for 20 months, that is a huge motivating factor for Mr. Delima. He wants that back, to be frank, and I think now he knows what he needs to do very clearly.

Prior to meeting with Counselor Smith, I don't think anybody had done an in-depth dive into, you know, what is going on here? And I think now that it's really been spelled out for him that these are the specific things you need to address through treatment, Mr. Delima is very serious about -- about taking whatever steps he needs to do, and he has those clear goals now that Counselor Smith has been able to provide for him that were lacking in the past.

So I think in terms of public safety, the Court can be assured through his progress in treatment in recent months, through that period of good behavior in the community prior to being brought in on the federal charges, and the overall insight Mr. Delima has gained into what needs to happen for him going forward that he really hasn't had the chance to reflect

on in any serious way prior to this. This is the longest period of incarceration he's ever served. My understanding, and as the Government points out in its memo, 18 months is the longest jail sentence Mr. Delima has ever served. He's now been in 20 months.

So in terms of looking at what would be sufficient, but not greater than necessary, our position is that he's already indicated that this period of incarceration is, you know, in theory sufficient enough. We don't see 55 months as -- as being necessary here. We believe that would be greater than necessary, that 37 months is sufficient, but not greater than necessary, taking into account all of the 3553(a) factors.

THE COURT: Has he paid any restitution?

MS. PULS: No, your Honor. He has been incarcerated, obviously, during this entire time period, so there has not been any payment towards restitution yet.

THE COURT: What happened with the products that he sold, though? Is that money gone, then?

MS. PULS: Yes. Mr. Delima has no funds at this point. He's indigent. Any proceeds that he did make from reselling any of the sneakers that he purchased, it is my understanding there's not savings at this time. Mr. Delima, of course, understands and takes seriously his restitution obligation. He does have plans to start working as soon as he's released. He can work at his fiancée's salon, that he

also has other plans that he has in mind and is also hoping at some point to continue his education, but he certainly takes seriously his restitution obligation. It's -- and I would point that the actual loss to the Government was about $18,000, so it's not a -- I think Mr. Delima takes that seriously and will be dedicated to repaying that amount.

THE COURT: I think it's calculated, though, by the presentence report at $20,798.12, and I didn't see that that was contested. And it was in the plea agreement, I believe, as well.

MS. PULS: Yes.

THE COURT: So it's the amount he owes in a certified statement from the Small Business Administration with the interest daily rate attached to it.

MS. PULS: Yes, your Honor. So the amount he owes takes into account some interest that has accrued, the actual initial loan; and the actual loss was, I believe, 17,000 and -- it was close to $18,000. And that does -- it's sort of a minor point in the grand scheme of things, but I would note in terms of his guideline calculation, he did get a plus 12 in his calculation. That includes the intended loss.

There was this -- as your Honor saw, this other application. It was not a sophisticated attempt, we would argue, in terms of seeking a second loan. It was a pet spa business that claimed to have 30 employees and just overall

didn't seem very sophisticated or a very -- anyways, so the guidelines were increased by plus 12, and that includes an intended loss. The actual loss to the federal government was less than $18,000. So in terms of the offense conduct, we would just want to highlight that.

But, yes, Mr. Delima, as soon as he is back out in the community and working, will fully intend to begin his restitution payments.

THE COURT: All right. Mr. Delima, do you want to make a statement on your own behalf?

THE DEFENDANT: I just want to say that, you know, I'm sorry for the things that I did, and basically, like, since I've been incarcerated, I've had a rough time. I've been going through a lot here. Like, I did have a mental health crisis back in February and March, and, like, I'm not just in a facility acting crazy and just -- you know, just -- like, I really went through some stuff. When I woke up, I didn't even know what year it was. So I'm not just sitting there just -- you know, just doing crazy things for no reason. Like, I really had something going on, and, you know, I'm trying to be a better person and get back home to my family. That's about it.

THE COURT: Do you mind if I ask you some questions?

THE DEFENDANT: Sure. Why not?

THE COURT: So I'm not, you know, so worried about

this fact pattern. I'm worried about the future. Because you're getting older. You have children dependent on you. You actually have a good life to go back to. And if I wanted to predict the ways I would think that you would get into trouble, I would say alcohol and firearms. You will find yourself in trouble. You also seem to know people who could get you into trouble in the community.

So what is your plan for the future?

THE DEFENDANT: Well, my plan for the future is to go home and be a parent to my children. I've been incarcerated before, but I'd never had children before when I was incarcerated, so now this is what I learned. Like, I learned how much my children need me since I've been in here. Like, when I go home, I don't need a firearm. Like, I'm not going back to do none of the things that I was doing when I was home before.

I now have a stable residence where I live; I have employment; I have opportunities. I don't have to do the things that I -- that I was doing before. Before, I kind of felt like, you know, it was the pandemic; it was a lot of stuff going on; I lost my dad; I was homeless. Like, I was just in a bad situation, and then, you know, I made a bad -- I made bad decisions.

Right now I have a great support system and I have people that really need me. I don't have to do any of those things.

I'm not living a lifestyle where I need a firearm, so trust me, I'm never going to pick up another firearm again. I've definitely learned my lesson from this.

THE COURT: From the Court's perspective, behavior is a message. So that's why I look at how people behave in jail, because if you're not motivated to behave in jail when you're awaiting sentencing, I can't imagine a time when you would be more motivated. And some of this is mental health and some of it is, you know, smoking pot or doing whatever while you're incarcerated.

Do you agree that whatever additional time I give you, your behavior should be pretty close to perfect during that time if this is really a change that means something?

THE DEFENDANT: Yes. And then so just to touch on that briefly, so the DRs where they said that I was smoking or whatever, I've never had a dirty urine since I've been in prison. Like, these are just accusations, and they said that the hearings weren't held because I left the facility. I was in these facilities after these DRs for more than 20 days.

In New York state, the facility that it happened at, they have maybe five business days to hold these hearings. Sara has called and verified that. So it wasn't because I left the facility. It was because some of the stuff that they wrote wasn't factual and then -- so I am going to admit I just was in the wrong place hanging out with the wrong people, but I was

not doing some of the things that they said that I did.

And then as far as, like, my behavior while I was awaiting sentencing since the last time I saw you when you told me not to get in trouble, I didn't get in trouble on my own behalf. I really had, like, a complete mental breakdown, and the things that I was going through at MDC, like, the conditions there were really hard. Like, we really had -- like, we had food with maggots in it. Like, the place is terrible. Like, they didn't have socks for us, T-shirts, drawers. We were constantly locked in every day. Like, that place was crazy. Like, it should be closed.

So, like, I just -- and then I went back -- I was in solitary confinement before I left there, and then I went to another facility back into solitary confinement not for behavior, just because they do these COVID restriction things, and then at some point, like, I just -- like, I lost it. Like, I don't know what happened. I just remember I woke up and I was crying, and I called Sara and my mom, and I didn't even know what year it was. Like, I was, like, out of it. So I didn't do -- you know, I was not just misbehaving.

THE COURT: Okay. So I get over things and push them aside and face forward, and I need you to do that too, but we are going to hold you accountable going forward, and when you come out on supervised release, it's the same thing. You do what you're supposed to do - we don't want to interfere with

your life - you'll have more liberty.  If you're doing stuff like dabbling in smoking pot or you're drinking or you're having a domestic, then we get back into your life, and I just want to hear that we're not going to have that kind of supervised release and we're not going to see that in whatever time you have left in jail.  The behavior will be the message, and the message is "I'm a grown-up.  I'm a father.  I'm returning to my community as a responsible citizen."  Can you deliver that message?

THE DEFENDANT:  Yes, I can definitely deliver that message.  My wife doesn't smoke or drink, so there's definitely going to be no pot smoking.  I've got five kids at the house, so I'm definitely not going to be home smoking pot and I'm definitely not going to come back to jail for a joint of pot.  Like, it's not worth it.  I refuse to lose my kids over a joint of pot or lose my family just for a smoke or a drink.  Like, it's not worth it.  The stuff that I've been going through, I would not even put myself through that, like, to have to go through this again just for a drink or a smoke or, you know, like, something silly.  I'm definitely straight on that.

THE COURT:  Or even the underlying crimes.

THE DEFENDANT:  Yeah.  Like --

THE COURT:  Discharging a firearm and the PPP loan, all stuff totally avoidable.

THE DEFENDANT:  Yeah.  And then even -- like, even

with the underlying crime, like, when I was going through that, like, I was in the middle of a mental health crisis. If you saw the video when I was arrested, like, I barely could stand up; I barely could talk. Like, I was not myself. That is not something that I would normally do. That's not my regular behavior. I'm not that type of person.

THE COURT: Okay. That's good to hear. Anything else that you want to say before I turn to the prosecutor?

THE DEFENDANT: I would just like to apologize to my community, you know, for making a fool of myself and making the community feel unsafe, you know, and to anybody that I've hurt.

THE COURT: All right. Thank you.

Ms. Cowles.

MS. COWLES: Your Honor, as the Court's aware, the Government is asking for a 55-month sentence in this case to come along with orders of restitution and forfeiture alleged in the indictment.

This really isn't a case for a downward variance below the guidelines, and I think it's because when we look at the full pattern of behavior -- and in this case you have two different perspectives. You have the fraud side and you have within a year the sort of reckless disregard for the community with the firearms and the drug and the discharge.

What we see in that pattern is that Mr. Delima has for quite some period of time done what he wants to do. If he is

interested in money, he's willing to lie to get it.  If he wants to sell drugs, he sells drugs.  If he wants to fire off a gun, he fires off a gun.  And I think that's consistent with the criminal history the Court looked at where we see violent incidents popping up.  And I think it's consistent with the behavior through the DRs.

We see this pattern of sort of disregard for the community around him, and I think while it's good to hear about positive changes Mr. Delima may be willing to make now, when we look at an appropriate sentence, we have to also look at sanctioning the behavior.

As we pointed out, he's never served more than 18 months, and he ended up in a situation where he just engaged in an extensive spree of behavior that put the community in great risk.

The Court noted that some people who are convicted for PPP loan fraud simply get probation.  You noted the size in this fraud is different.  But I think the question is really what the Court ended with:  Could Mr. Delima stop the behavior?  He should be able to.  We've all read the PSR.  We understand he's very bright.  But when you look at the pattern of behavior, the mix of drugs and guns and financial lies, the history that involves apparent violence against the community, and then we see the behavior even after he went into custody in this case, we see someone who, yes, for a period of a month or two has

been able to behave at various points in his life but overall has this consistent disregard for those around him and a consistent willingness to do whatever it is that he wants to do. And I think for that reason, it puts the "could he stop the behavior?" in greater question.

Again, he should be able to, and I think any sentence should include a full period of supervised release, the three years. It should include counseling and treatment coming out of custody. But I don't think that's a reason to reduce the custody now.

We have the unusual situation of having a defendant who committed two very diverse types of crimes right on the heels of each other, and I think the only common thread is that disregard for the community, and I think that's what we are asking the Court to sanction with a 55-month sentence here.

THE COURT: All right. Thank you.

Anything further from you, Ms. Puls?

MS. PULS: No. Thank you, your Honor.

THE COURT: The Court begins with the guideline calculation.

Pursuant to the decisions of the Supreme Court in *United States v. Booker* and *Gall v. United States*, and the Second Circuit Court of Appeals' decision in *United States v. Crosby*, in determining the following sentence, the Court has considered the United States Sentencing Guidelines applicable in this

case, including all departure authority contained in the guideline policy statements, as well as all the factors enumerated in 18 USC, Section 3553(a).

The Court finds as follows:

The offenses of wire fraud, in violation of 18 USC, Section 1343, and false statements, in violation of 18 USC, Section 1001, Counts 1 and 2 under docket number 2:23-CR-71, occurred on or about April 17th, 2021; and the offense of felon in possession of a firearm, in violation of 18 USC, Section 922(g)(1) and 924(a)(8), Count 1 under docket number 2:22-CR-111, occurred on or about July 2nd, 2022. Hence the sentencing guidelines apply.

Counts 1 and 2 under docket 2:23-CR-71 meet the grouping criteria in U.S. Sentencing Guidelines Section 3D1.2(c). Therefore, U.S. Sentencing Guidelines Section 2B1.1 is used for the guideline calculation assigned under Count Group 1.

Counts 1 and 2 under docket 2:23-CR-71, Count Group 1, and Count 1 under docket number 2:22-CR-111, Count Group 2, do not meet the grouping criteria in U.S. Sentencing Guidelines Section 3D1.2. Consequently, each group is treated separately in the guideline analysis.

COUNT GROUP 1 (WIRE FRAUD & FALSE STATEMENTS)

The guideline for this offense is found in Section 2B1.1 of the *Guidelines Manual*, November 1st, 2023, edition. The base offense level is seven pursuant to U.S. Sentencing

Guidelines Section 2B1.1(a)(1).

Specific offense characteristics apply.  The loss was more than $250,000.  Therefore, the offense level is increased by 12 levels pursuant to U.S. Sentencing Guidelines Section 2B1.1(b)(1)(G).  The adjusted offense level is 19.

COUNT GROUP 2 (FELON IN POSSESSION OF A FIREARM)

The guideline for this offense is found in Section 2K2.1 of the *Guidelines Manual*, November 1st, 2023, edition.  The defendant was a prohibited person at the time he committed the instant offense, resulting in a base offense level of 14 pursuant to U.S. Sentencing Guidelines Section 2K2.1(a)(6)(A).

Specific offense characteristics apply.  The offense involved a stolen firearm, resulting in an increase of two offense levels pursuant to U.S. Sentencing Guidelines Section 2K2.1(b)(4)(A).

The defendant possessed firearms in connection with another felony offense, resulting in an increase of four offense levels pursuant to U.S. Sentencing Guidelines Section 2K2.1(b)(6)(B).  The total adjusted offense level is 20.

In determining the combined offense level pursuant to U.S. Sentencing Guidelines Section 3D1.4, one unit is assigned to each count group, resulting in a two-level increase to the highest offense level.  The adjusted offense level is 22.

The defendant demonstrated an acceptance of responsibility for his offense.  Therefore, the offense level is reduced by

three levels pursuant to U.S. Sentencing Guidelines Section 3E1.1. The total offense level is 19.

The defendant has nine criminal history points, resulting in a criminal history category of IV. The guideline imprisonment range for an offense level of 19 and a criminal history category of IV is 46 to 57 months.

The Court has accepted the parties' Rule 11(c)(1)(C) plea agreement to a sentencing range of 37 to 55 months.

The guideline range for a term of supervised release is one to three years. Since the applicable guideline range is in Zone D of the sentencing table, the defendant is ineligible for probation.

In addition to the sentencing guidelines, the Court considers the factors set forth in 18 USC, Section 3553(a), in an effort to impose a sentence that is sufficient, but not greater than necessary.

In deciding what is a sufficient, but not greater than necessary, sentence, the Court looks at a number of factors: the nature and circumstances of the crime; your history and characteristics; the need for the sentence imposed; the kind of sentences available; the need to avoid unwarranted sentencing disparities between defendants with similar criminal histories who've committed similar crimes. So you should not get a sentence that is substantially more harsh or more lenient than somebody else in your criminal history category unless there's

a reason for it.

In deciding the need for the sentence imposed, the Court is directed to reflect the seriousness of the offense; promote respect for the law; impose just punishment; protect the public from future crimes by you; impose what we call specific deterrence, say to you, "Mr. Delima, don't do this. It has consequences," hopefully you'll be motivated never to be back here, and also general deterrence, say to the community at large, "These are crimes that threaten the public in two different ways. We can't have this. It affects the community, so whoever is committing these crimes must have consequences as well," and hopefully other people will be motivated not to be here.

The Court also needs to make sure you get rehabilitation, substance abuse/mental health treatment, vocational and educational opportunities in the most effective manner.

In this case, the parties are right: These are two very different crimes, and I'll take one first and the next one.

The PPP loan, the first one was kind of standard fraud in an amount that could be conceivable that you were actually out that amount, and this is what people were doing, unfortunately, in the pandemic. We're all going to pay for it. It's not free money, and we're all going to find that out sooner or later, and that includes you.

The other scheme where you're asking for $350,000, I agree

with your attorney: It's not only unsophisticated; it was like an immediate red flag that this is fraud. Nobody looked at that application and said, "There's a pet shampooing business in Burlington with that many employees generating that kind of income." So for someone who's smart, I do wonder what kind of mental state you were in, and I take you at your word that you were in a bad place and you weren't, you know, yourself and you weren't doing what you would normally do.

So that's one crime. And if we were just talking about that, it would be something that if you were paying your restitution we would be looking at probation, that kind of thing.

The other crime, discharging a firearm in Burlington at night; having, you know, distribution quantities of drugs on you and a fair amount of cash; discarding the firearm where somebody else might pick it up, loaded, and end up dead, that was really reckless behavior. That has a direct impact on the community. Thankfully, a child didn't pick it up. Thankfully, you weren't pointing it at anybody or trying to threaten people. I don't know what you were doing, but I agree with you based on the video that you probably were not necessarily in your right mind. So not a great fact pattern for felon in possession of a firearm, but unfortunately not the worst fact pattern I've seen either.

So we have two crimes that are somewhere in the middle

range, and your sentence should reflect that.

Your history and characteristics. It would have been wonderful to see you go into a setting where your gifted intellect was rewarded and not punished and you weren't picked on for it and you were supported by the people around you. Who knows? You know, you might have been a chess champion. Who knows where it would have taken you?

What happens thereafter does become your responsibility. So I know you've seen a lot of traumatic things and you've seen a lot of violence, but you're responsible for you, and you need to look at that past record of violence, especially with more vulnerable people, like women, and ask yourself: Is alcohol something I have to stay away from? What is the common denominator? Because that behavior cannot continue. That's directly threatening the community, and that behavior is what I'm most concerned about.

I think you have a lot to lose and have a lot to go back to. You have -- you know, when you get back into the community, you're going to have, if all goes well, a job, a home, a family, something that other people have to work, you know, for a long time for, and I'm not saying that you didn't work for those things. That's a pretty good motivator. But the behavior's going to tell the real story. Are you motivated, or are we going to be coming back here on supervised release because you met up with the wrong person and got

yourself into trouble?

I think you can do it, and for that reason I don't think you need to be at the top of the guidelines, but I do think the bottom of the guidelines isn't an appropriate place for you to be sentenced in light of the collective factors. And I am going to give you the three years of supervised release because I think you need to settle into the community, show that you can conform your behavior to what's expected, go live your life, and then you'll be off supervised release.

So for all of those reasons, the Court has determined that a sentence of 46 months on Count 1 and Count 2, followed by a three-year term of supervised release, is a sufficient, but not greater than necessary, sentence.

Please stand.

It is the sentence of the Court that the defendant be committed to the custody of the Federal Bureau of Prisons for 46 months on Counts 1 and 2 under docket number 2:23-CR-71 and 46 months on Count 1 under docket number 2:22-CR-111, with credit for time served to which he is entitled, if any, all counts to run concurrently, for a total sentence of 46 months, to be followed by a three-year term of supervised release on each count, concurrent, for a total sentence of supervised release of three years.

The conditions of supervised release are as follows:

You must not commit another federal, state, or local

crime.

You must not unlawfully possess a controlled substance.

You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment or placement on probation and at least two periodic drug tests thereafter, as determined by the Court.

You must cooperate in the collection of DNA as directed by the probation officer.

You must comply with the standard conditions of supervision adopted by this court. Those conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the Court about, and bring about improvements in your conduct and condition.

You must make restitution payments in an amount of 10 percent of your gross monthly income until the financial obligation is paid in full. You must notify the Court immediately of any material change in your economic circumstances that might affect your ability to pay financial penalties.

You must not incur new credit charges or open any additional lines of credit without approval of the probation officer until the financial obligation is paid in full.

You must provide the probation officer with access to any requested financial information and authorize the release of any financial information to the probation officer.  The Probation Office may share financial information with the United States Attorney's Office for the purpose of collecting outstanding financial penalties.

You must participate in a mental health program approved by the United States Probation Office.  You shall contribute to the cost of services rendered in an amount to be determined by the probation officer based on ability to pay or the availability of third-party payment.

You must submit your person; property; house; residence; vehicles; papers; computer, as defined in 18 USC, Section 1030(e)(1); other electronic communications or data storage devices or media; or office to a search conducted by a United States probation officer.  Failure to submit to a search may be grounds for revocation of release.  You must warn any other occupants that the premises may be subject to searches pursuant to this condition.  An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that you have violated a condition of supervision and that the areas to be searched contained evidence of this violation.  Any search must be conducted at a reasonable time and in a reasonable manner.

You must participate in substance abuse treatment, which

may include a substance abuse assessment with a licensed substance abuse provider, and abide by any programmatic treatment recommendations. This program may include testing to determine whether you have reverted to the use of drugs or alcohol. You shall contribute to the cost of services rendered based on ability to pay or the availability of third-party payment. You must refrain from the use of alcohol and other intoxicants during and after treatment.

The guideline fine range is from $10,000 to $100,000. The defendant has demonstrated an inability to pay a fine. Hence all fines are waived.

Restitution in the amount of $20,798.12, plus interest, is ordered, due immediately, to the victim noted below. The clerk of the court shall direct restitution payments as follows: to the U.S. Small Business Administration.

Any unpaid financial penalty imposed shall be paid during the period of incarceration at a rate of 10 percent of the defendant's quarterly earnings. Defendant may voluntarily pay in excess of this amount while incarcerated.

Defendant may request a hearing regarding his ability to pay at any time.

A special assessment of $300 is imposed, due immediately.

The Court recommends the defendant receive mental health treatment while incarcerated and educational and vocational opportunities.

Both the defendant and the Government may have the right to appeal this sentence, as set forth in Title 18, U.S. Code, Section 3742. If the defendant is unable to pay the cost of an appeal, he has the right to apply for leave to appeal *in forma pauperis*, in which event we would waive the cost of an appeal, and he may request the Court to appoint counsel for him. If the defendant so requests, the clerk of the court shall prepare and file forthwith a notice of appeal on behalf of the defendant. Notice of appeal by the defendant must be filed within 14 days of the date judgment is entered on the docket pursuant to Rule 4(b) of the Federal Rules of Appellate Procedure.

Ms. Cowles, do you have anything to dismiss in this case?

MS. COWLES: I do, your Honor. And one point of clarification. For the 2:22-CR-111 docket, there's a forfeiture notice forfeiting the firearm. I assume with the conviction on Count 1, the Court would consider the order of forfeiture for the firearm.

THE COURT: Yes. I didn't see anything about that in your sentencing memo.

MS. COWLES: I did not put it in my sentencing memo. I apologize for that, your Honor.

THE COURT: Okay. So you want a forfeiture judgment for the firearm in -- as set forth in paragraph what of the plea agreement?

MS. COWLES:  I believe --

COURTROOM DEPUTY:  I think it's at paragraph 11.

MS. COWLES:  Thank you.

THE COURT:  Paragraph 11 of the plea agreement.  Any objection to that, Ms. Puls?

MS. PULS:  No objection, your Honor.

THE COURT:  All right.  The Court will enter a judgment of forfeiture for the firearm set forth in paragraph 11 of the plea agreement.

And if you -- did you do your preliminary order of forfeiture for that?

MS. COWLES:  I'm not sure whether we did, your Honor, so we will have to figure out --

THE COURT:  You need to do that too.

MS. COWLES:  -- what paperwork still needs to be done in that case.  I believe the firearm was initially held as evidence, and we will be moving with the order now.

THE COURT:  Okay.  And you were going to dismiss something.

MS. COWLES:  Yes, your Honor.  As to the docket 2:22-CR-111, we move to dismiss Count 2.  And as to the docket 2:23-CR-71, we move to dismiss Count 3.

THE COURT:  Any objection?

MS. PULS:  No objection, your Honor.

THE COURT:  They are dismissed.

Ms. Puls, do you have any recommendation as to where Mr. Delima serves his sentence?

MS. PULS: Yes, your Honor. If the period of incarceration is low enough, to a local -- serving his sentence locally is possible, that is his first request. If not, FCI Otisville.

THE COURT: Okay. Locally, we don't have a postsentencing contract with anybody.

So the Court recommends the defendant be incarcerated at FCI Otisville in the lowest security setting available to him.

Mr. Delima, I will talk to the judges in the Eastern District of New York about MDC/MDI Brooklyn and about what you reported about the conditions there. I know they're concerned about it as well, and I will tell them that the Vermont judges share your concerns, and we'll see if we can get that situation turned around.

You're going to come out. You're going to rejoin your community. Everybody wants you to succeed. If you're struggling, reach out to the probation officer. That person's job is to help you stay in the community. And let's see if we can get through that period without any further need for intervention. If we do, let's take care of the problem right away and turn it around. So good luck to you.

THE DEFENDANT: Thank you.

(Court was in recess at 10:51 AM.)

C E R T I F I C A T I O N

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

August 28, 2024 _____

Johanna Massé, RMR, CRR